

# In the Missouri Court of Appeals Eastern District

## DIVISION TWO

GERALD POGER, et al., ) ED103293
)
Appellants, )
)
) Appeal from the Circuit Court
v. ) of St. Louis County
) 12SL-CC00042
MISSOURI DEPARTMENT OF )
TRANSPORTATION, et al., ) Honorable Thomas J. Prebil
)
Respondents. ) Filed: June 7, 2016

## Introduction

Appellants, a class of homeowners, filed several claims against Respondents Missouri Department of Transportation (MoDOT), Wood Lake Residents Association (Association), and Community Managers Association, Inc. (CMA), after the Association negotiated with MoDOT for the purchase of a portion of common land in the Wood Lake Subdivision (Subdivision). Appellants appeal the trial court's summary judgments in favor of all Respondents. We affirm in part and reverse in part.

## Background

Appellants are a class of homeowners who own lots in the Subdivision. In October of 2009, MoDOT paid the Association $1.5 million in exchange for 27.05 acres of property (the Property) within the Subdivision, all of which was designated as common land.

MoDOT acquired the Property in order to complete a project extending and widening Missouri State Highway 141.

The Association sought input from homeowners regarding how the proceeds from the sale should be spent, asking that homeowners respond by February 28, 2010. The Association ultimately spent $250,000 on a new swimming pool and distributed approximately $500,000 to 28 homeowners whose property value had diminished because of the highway project.

On January 5, 2012, twelve homeowners initiated the present lawsuit. After rounds of amended pleadings, Appellants filed their fifth amended petition, which became a class action representing all homeowners in the Subdivision, including over 450 separate individuals and entities. This petition brought four claims against MoDOT: inverse condemnation, taking, violation of equal protection, and unlawful seizure. All of these claims were premised on the argument that the Association had no authority to sell the Property. Appellants' petition also contained five claims against the Association and CMA, the managing and servicing agent of the Association. These included claims for money had and received, breach of fiduciary duty, negligence, an accounting, and violation of the Missouri Merchandising Practices Act (MMPA).

The trial court granted summary judgment in favor of all defendants, finding that the Association had the authority to sell the Property and that Appellants were estopped from bringing their claims because they accepted the proceeds from the sale. This appeal follows.

2

## Standard of Review

Our review of summary judgment is essentially *de novo*. ITT Commercial Fin. Corp. v. Mid-Am. Marine Supply Corp., 854 S.W.2d 371, 376 (Mo. banc 1993). We use the same criteria for testing the propriety of summary judgment as the trial court employs to determine whether to grant the motion initially. Id. We view the record in the light most favorable to the non-prevailing party and accord that party the benefit of all reasonable inferences from the record. Id. The burden is on the movant to show a lack of dispute regarding material facts, and a right to judgment as a matter of law flowing from those facts. Id. at 377. We will affirm a summary judgment on any basis supported by the record. Leavitt v. Kakadiaris, 452 S.W.3d 235, 239 (Mo. App. E.D. 2014).

## Summary

Appellants raise four points on appeal, directed to both summary judgments the trial court entered. In Point I, Appellants argue that the trial court's summary judgment was improper because (1) Appellants had fee simple title to five of the six parcels of land constituting the Property; (2) none of the recorded instruments governing the Subdivision granted the Association the power to sell the Property; (3) Appellants did not ratify the sale; and (4) the Respondents waived their affirmative defenses. In Point II, Appellants argue there were various material fact disputes precluding both summary judgments. In Point III, Appellants raise two procedural issues: (1) that MoDOT's motion for summary judgment was a successive motion that the trial court should have denied; and (2) that the Association's and CMA's failure to file an answer precluded the trial court's grant of summary judgment in their favor. Finally, in Point IV, Appellants argue that the trial

3

court's summary judgment in favor of the Association and CMA was improper because it failed to address the elements of Appellants' claims against those parties.

We discuss Appellants' arguments in the most logical order. First, we address the trial court's summary judgment in favor of MoDOT, and Appellants' corresponding arguments in Points I, II, and III. The main issue is whether the Association had authority to negotiate and execute the sale of the Property, and whether, regardless of the Association's authority, Appellants were estopped from bringing their claims. Some of Appellants' claimed fact disputes in Point II are questions of law that we address together with Point I. We find Appellants' claims in Point III are ancillary procedural issues, and we address them in footnotes. We conclude the trial court's judgment in favor of MoDOT was proper.

Second, we address the trial court's summary judgment in favor of the Association and CMA, which corresponds to Appellants' Point IV, and parts of Points II and III. We conclude the trial court's summary judgment in favor of the Association and CMA does not fully dispose of Appellants' claims against these parties and must be reversed.

Judgment in Favor of MoDOT

In Point I, Appellants raise several arguments that the trial court's judgment was improper as a matter of law. The trial court's finding central to its grant of summary judgment in favor of MoDOT was that the Association had authority to convey the Property to MoDOT by virtue of the recorded Indenture of Trust and Restrictions of Wood Lake (Indenture), recorded contemporaneously with a general warranty deed granting one parcel of common land; along with five additional general warranty deeds granting additional parcels of common land to that Association in trust. The trial court also concluded that

4

Appellants' acceptance of the benefits from the sale barred their claims that the sale was improper. Appellants argue that the relevant recorded instruments did not authorize the Association's actions here, and that equitable doctrines of estoppel and ratification were insufficiently pled and do not apply. We find the trial court properly granted summary judgment in favor of MoDOT.[1]

### 1. Power of Sale

Before reaching the merits of the trial court's summary judgment, we address the procedural matter raised in Appellants' fourth argument in Point I; namely, that the trial court improperly considered the Association's power of sale as a basis for summary judgment. Appellants argue this is because the power of sale was an affirmative defense that MoDOT failed to timely raise and therefore waived. We find that while this was an affirmative defense, the trial court did not err in considering it.

"An affirmative defense is defined as a defendant's assertion of facts and arguments that, if true, will defeat the plaintiff's . . . claim, even if all the allegations in the complaint are true." Ressler v. Clay County, 375 S.W.3d 132, 140 (Mo. App. W.D. 2012) (quoting Black's Law Dictionary 482 (9th ed. 2009)) (internal alterations and quotations omitted). Affirmative defenses must be pled, or they will generally be waived. Holdener v. Fieser,

---

[1] Appellants raise two arguments in Point III, one of which is a threshold question to our analysis of Point I. Appellants argue that MoDOT's motion for summary judgment should have been denied as a successive motion after the trial court denied MoDOT's first motion for summary judgment. However, MoDOT filed its first motion before Appellants filed their fifth amended petition. The filing of an amended petition abandons all prior pleadings as well as any interlocutory orders or judgments entered thereon. Value Lumber Co. v. Jelten, 175 S.W.3d 708, 713-14 (Mo. App. S.D. 2005); see also Gillespie v. Gillespie, 634 S.W.2d 493, 494 (Mo. App. E.D. 1982) (order denying motion for summary judgment is interlocutory). Moreover, additional motions for summary judgment are permitted upon an expanded record, and here MoDOT submitted additional exhibits and put forth different legal arguments. See M & P Enterprises, Inc. v. Transam. Financial Servs., 944 S.W.2d 154, 162 (Mo. banc 1997). Point III is denied in this respect. We address Appellants' remaining argument in Point III, which is related to the trial court's summary judgment in favor of the Association and CMA, *infra*.

971 S.W.2d 946, 950 (Mo. App. E.D. 1998). "An appellant, however, may impliedly or expressly consent to trying the case on the defense." Id. The issue is whether allowing the defense prejudices the plaintiff in that the plaintiff did not have sufficient notice to prepare to address the issue. See id.; see also Green v. City of St. Louis, 870 S.W.2d 794, 797 (Mo. banc 1994) (noting that court may permit affirmative defense raised for first time in summary judgment motion if court would have allowed defendant to amend answer to include it; remanding for determination of factors under Rule 55.33(a) for permitting amendment of answer, including prejudice to plaintiff).

Here, Appellants' claims against MoDOT all alleged that Appellants had an ownership interest in the Property and MoDOT appropriated the Property in violation of Appellants' rights. Counts 1 and 2 both alleged MoDOT took or damaged the land without just compensation to Appellants; Count 3 alleged that in doing so, MoDOT discriminated against Appellants in violation of their right to equal protection under the law; and Count 4 alleged an unlawful seizure in violation of the Fourth Amendment to the United States Constitution. Thus, MoDOT's argument that the Association had the power to sell the Property to MoDOT can be true along with the fact that Appellants had an ownership interest in the Property and the fact that MoDOT did not compensate Appellants directly for the Property; and such an argument would defeat MoDOT's liability. This was therefore an affirmative defense.

Regarding Appellants' argument that MoDOT failed to timely raise this defense, MoDOT pleaded the following in its answer to Appellants' fifth amended petition:

> [MoDOT] . . . negotiated with the owner of the [P]roperty in question, and paid $1,500,000.00 to the owner thereof in exchange for a General Warranty Deed to the [P]roperty. In the alternative, if [Appellants] had an ownership interest in the

6

> [P]roperty, which is denied, [MoDOT] negotiated with [Appellant]s' agent who had express or apparent authority to negotiate with it for the purchase of the [P]roperty and [Appellants] did not complain about the alleged wrongful acquisition of the [P]roperty by [MoDOT] for a period of time, to the detriment of [MoDOT], and [Appellants] are, therefore, estopped from attacking the sale of the [P]roperty as alleged above.

Appellants argue that this defense is in fact an agency defense, which is distinct from MoDOT's argument that the Association had the power of sale, in that it alleges that Appellants actually had the authority to sell and then conferred that power on the Association. MoDOT's argument in its summary judgment motion, which the trial court eventually agreed with, was that the Association had the power to sell the Property regardless of Appellants' wishes.

The issue becomes then whether Appellants impliedly consented to trying this power of sale defense through the summary judgment motions. Appellants argue they moved to strike the power of sale argument from MoDOT's motion for summary judgment because they argued all affirmative defenses not pled were waived; however, their motion to strike discusses only MoDOT's equitable estoppel affirmative defense and their prayer for relief requests that the court strike MoDOT's "purported affirmative defense," in the singular. Moreover, Appellants filed their motion to strike over two months after filing their response to MoDOT's motion for summary judgment, which included arguments that MoDOT was mistaken in believing that the Indenture for the Subdivision gave the Association the power to sell the Property. Finally, at the hearing held in May and June of 2015 on the motions for summary judgment, the parties focused their arguments on whether the Association had the power to sell the Property regardless of who held title at the time of the sale.

7

Thus, we find that under the particular circumstances present here, Appellants impliedly consented to the power of sale defense. The trial court did not err in relying upon this defense in its summary judgment.

Turning to the merits of the trial court's finding that the Association had the power to sell the Property, there are seven relevant instruments, all of which are recorded. First, the Indenture, creating the Subdivision and laying out the restrictions and covenants upon the Subdivision, was recorded on October 14, 1968. This document names the Association as the Trustee. Filed contemporaneously with the Indenture is a general warranty deed conveying a parcel of property to the Trustee as common land. The Indenture states that this grant conveyance is for a period of 50 years, after which "fee simple title to the described property shall vest in all of the then record owners of all lots and dwelling units . . . as tenants in common."[2] While this period has not yet expired, it is noteworthy that this eventual ownership interest of the homeowners in the common ground is qualified in the Indenture as follows:

> [The] rights of said tenants in common shall only be appurtenant to and in conjunction with their ownership of lots . . . and none of the owners of the common land shall have such rights of ownership as to permit them to convey their interest in the common land except as an incident to the ownership of ...such lot or dwelling unit . . . .[3]

Thus, at no point will the homeowners obtain the right to sell their interest in the common land under the Indenture and the first contemporaneously filed deed, apart from a sale of

---

[2] Similarly, the general warranty deed recorded with the Indenture states that the parcel of property is conveyed to the Trustee as follows:
> To have and to hold the same, in Trust in accordance and pursuant to Indenture . . . for a period of Fifty (50) years from the date hereof, after which period of time, fee simple title shall vest in the then property owners of [the] Subdivision . . . .

[3] The general warranty deed accompanying the Indenture contains a substantively equivalent restriction.

8

their own lots or dwelling units. Furthermore, even after title vests in the owners of the lots, "all of the rights, powers and authority conferred upon the Trustee . . . shall continue to be exercised by the said Trustee."

The Indenture also provides that it applies to other land that will later be conveyed to the Subdivision: "[A]s each of the subsequent plats of [the Subdivision] is recorded, [the grantor] will adopt this Indenture of Trust and Restrictions and all provisions thereof for each of said plats." The Indenture states that "[t]he Trustee shall acquire and hold any 'Common Land' described and conveyed to the Trustee by separate instruments." Finally, the Indenture states that the Trustee "shall deal with any 'Common Lands' so acquired under the provisions hereinafter set forth," including the following provision containing the power of sale:

> [T]o lease, sell, exchange or otherwise dispose of any part of said Common Land as has not been considered in determining the density computation for qualifying [the] Subdivision as a Planned-Environment Unit . . . .

Thus, according to the language of the Indenture, the Trustee's power to sell the common ground under the conditions specified here continues indefinitely.[4]

Additionally, there were five other conveyances of land making up the Property, contained in nearly identical general warranty deeds, executed in 1972 or 1973. The deeds all assign the Property to the Association "in trust in accordance with and pursuant to the

---

[4] One of Appellants' arguments in Point II is that a factual dispute exists over whether the covenants and restrictions contained in the Indenture run with the land. We find that in this particular case, whether the provisions of the Indenture are "real covenants" in that they run with the land, or "personal covenants" made only between the grantor and grantee, does not affect the outcome here. This is because personal covenants bind subsequent purchasers who have actual or constructive notice of the covenants. Hemsath v. City of O'Fallon, 261 S.W.3d 1, 4 (Mo. App. E.D. 2008). Because the Indenture is recorded, Appellants have at least constructive notice of its terms, and it is therefore binding upon their ownership interests in the Subdivision, regardless of whether it runs with the land. See Wolfner v. Miller, 711 S.W.2d 580, 583 (Mo. App. E.D. 1986) (purchaser has constructive notice of subdivision restrictions recorded prior to purchase). Point II is denied in this respect.

9

Indenture . . . for a period of twenty (20) years . . . after which period of time, fee simple title shall vest in the then property owners of [the Subdivision], as joint tenants." By their terms, the 20-year periods contained in these general warranty deeds have expired. However, this grant of title to the homeowners in these five conveyances contains similar qualification language as the Indenture; namely, that none of the joint tenants retain the right to convey their interests in the common land, except as incident to sales of their lots or dwelling units. The five deeds similarly provide that the powers of the Trustee shall continue even after title to the land vests in the owners.[5]

Therefore, all six of the deeds and the Indenture similarly restrict the homeowners' rights to independently sell the Property, and these documents prescribe similar powers and rights of the Association as Trustee as it relates to the Property. While Appellants dispute that the Indenture applies to all of the Property here, we find the plain language of the Indenture, the original general warranty deed, and the five later general warranty deeds expresses an intent that the Indenture govern all common ground in the Subdivision.[6]

"The Indenture of Trust and Restrictions is a contract to which each homeowner becomes a party when acquiring property in the subdivision." Maryland Estates Homeowners' Ass'n v. Puckett, 936 S.W.2d 218, 219 (Mo. App. E.D. 1996). "By acquiring the property the owners agree to the terms of the restrictive covenants contained

---

[5] Specifically, the five deeds provide the following:
> [T]he rights of said joint tenants shall be only appurtenant to and in conjunction with their ownership of lots in [the Subdivision] . . . and none of the owners of common property shall have such rights of ownership as to permit them to convey their interest in the common property, except as an incident to the ownership of a regularly platted lot[.] . . . [A]ll the rights, powers and authority conferred upon the Trustee . . . shall continue to be possessed by the said Trustee.

[6] In Point II, Appellants also argue that whether the Indenture applies to all of the Property is a disputed fact. However, we find that this is a question of law based on the language in the Indenture, and we have found the Indenture applies to all of the Property. Point II is denied in this respect.

in the Indenture." Id. Therefore, our task in interpreting this contract "is to ascertain the parties' intent and give effect to that intent." Capitol Group v. Collier, 365 S.W.3d 644, 649 (Mo. App. E.D. 2012).

As we have already seen from the language of the Indenture, the intent is clear: more land will be added to the Subdivision as common land, and the Indenture will govern such land. When that land was added later by five additional general warranty deeds, those deeds also stated that they were recorded in accordance with and pursuant to the Indenture. Thus, the language in the Indenture applies to all six deeds comprising the Property.

Specifically, as relevant here, the Indenture contains a restriction on Appellants' rights to sell the common land, and all six of the general warranty deeds contain the same restriction. By acquiring lots or dwelling units in the Subdivision, which are subject to the Indenture, Appellants have relinquished any individual rights they may otherwise have had to sell their interests in the Property except as incident to sales of their lots or dwelling units. In fact, had any of the Appellants attempted to independently sell the Property, any homeowner in the Subdivision could have brought a suit in equity to enforce the Indenture. See Hoag v. McBride & Son Inv. Co., 967 S.W.2d 157, 168 (Mo. App. E.D. 1998) (Missouri courts "allow[] landowners to bring actions seeking to enjoin the improper use of the burdened land").

This right of sale has been contractually granted to the Trustees, and it exists regardless of the holder of legal title at the time of sale. We find that the same language contained in the six deeds, along with their enactment "pursuant to the Indenture," expresses the parties' intent to harmonize these documents and all homeowners agreed that

11

the Trustees will continue to exercise their rights and duties over the common land, including the power of sale, regardless of which party holds title.

Appellants argue that even if this is true, a problem remains, because the Trustees' power of sale in the Indenture applies only to land not considered in the Subdivision's density computation as a planned-environment unit, and MoDOT failed to establish that the land it purchased was not included in such computation. However, the Indenture and the six general warranty deeds must be read together. Cf. Paddock Forest Residents Ass'n, Inc. v. Ladue Serv. Corp., 613 S.W.2d 474, 477 (Mo. App. E.D. 1981) ("Language used in the entire instrument, not just one clause, will be considered. . . . Principles of construction should not be applied in a way to defeat the plain purpose of the restriction").

There is one provision contained in all of the five later general warranty deeds that does not appear in the Indenture or the first general warranty deed, and it relates specifically to conveying Subdivision property to a public agency:

> In the event it shall become necessary for any public agency to acquire all of or any part of the property herein conveyed to the said Trustee, for any public purpose, the Trustee, during the period of Trust, is hereby authorized to negotiate with such public agency for such acquisition and to execute instruments necessary for that purpose. Should acquisitions by eminent domain become necessary, only the Trustee need be made a party . . . .

This provision empowers the Trustee to negotiate with a public agency for the acquisition of common land and does not restrict the land that the Trustee may convey to only that which is not considered in determining the density computation for the Subdivision.

Appellants argue this provision is inapplicable because it states the Trustee may exercise this power "during the period of Trust," and the 20-year periods contained in the five later general warranty deeds have expired. However, reading this provision in

12

accordance with other provisions stating that the powers of the Trustee are to continue, even after title vests in the homeowners, we must conclude that the "period of Trust" includes this time during which the Trustee continues to act as Trustee.

Appellants urge that such a reading renders the words "period of Trust" superfluous. However, because the documents deny the homeowners a power of sale, to read them as Appellants suggest would mean that no party has had the power to sell the common land that was conveyed under the five later general warranty deeds since 1992 or 1993, respectively. This is an illogical result and does not comport with the parties' intentions that the Trustee will continue to act as Trustee over the common land regardless of who holds legal title. Appellants imply that the Association's rights with regard to the common land granted by the five later general warranty deeds have terminated; however, there is no corresponding indication Appellants have assumed the duties related to maintaining the common land.

Appellants' final argument is that even if this provision in the five later general warranty deeds regarding the sale of common land to a public entity applies, it only applied to the five parcels of land granted by those deeds, and not to the one parcel conveyed originally with the Indenture. The Property MoDOT purchased was comprised of portions of all six parcels. However, we find that under the specific circumstances here, reading all of the documents together, to interpret them as anything other than granting the Association the power to carry out the sale in this case would be inconsistent with the intent of the documents and lead to inconsistency in carrying out the Trustee's duties across the Subdivision.

13

The deeds' provision authorizing the Association to negotiate with a public entity is a recognition that a future occasion may arise on which a public entity will seek to acquire part of the common land. Separate from a sale initiated by the Association, which under the Indenture must take into account the density determination, the deeds add the possibility that this land may be taken by a public entity. It seems in such a case, the original grantors of the common land desired to empower the Association to negotiate, perhaps for a better price through a sale than the public entity would pay as just compensation for a taking. If we read this as applying only to a portion of the Property here, it would have complicated the sale and perhaps resulted in MoDOT pursuing eminent domain instead. As it happened, the Association retained one of the top Missouri real estate and eminent domain attorneys to negotiate a purchase price of $1.5 million for approximately 27 acres of land. After MoDOT's initial offer of $980,000 based on its own appraisals and identification of 19 homeowners whose property values would be affected, at the end of negotiations MoDOT paid $1.5 million and the Association's attorney identified another nine homeowners who were compensated for diminution in value of their properties.[7]

We conclude the grantors of the common land intended that the Association would continue to act as Trustee even after title to the common land passed to the then owners of lots and dwelling units, and that the powers of the Association as such included the power to execute this sale of common land to a public entity, regardless of the density

---

[7] Notably, at least two of the homeowners in the class of Appellants who communicated dissatisfaction to the Association, both of whom are licensed Missouri attorneys, assumed that the Association had the power to sell the Property. Their demands to the Association were that the Association distribute the sale proceeds directly to the homeowners, but they did not contest that the Association had the right to make the sale in the first place.

14

computation.[8]  Accordingly, we hold also that Appellants have no direct claim to the proceeds of the sale except as beneficiaries under the Indenture. Their rights in the Property were only appurtenant and incident to their rights as owners of their lots or dwelling units, even after title vested in them. The only proceeds from a sale to which they were entitled were from sales of their lots or dwelling units, and the sale price of their lots would include the value of their interest in the common land.

Thus, under the circumstances here, Appellants have no basis on which to claim that MoDOT violated their right to sell or reject a sale of the Property. They had no such right. Moreover, MoDOT did not violate Appellants' rights by appropriating the Property through the Association. MoDOT negotiated with and paid the purchase price to the Association as Trustee. The Association was compelled to execute the sale and to hold and to spend the proceeds in accordance with its duties as Trustee, for the benefit of Appellants. Whether the Association did so is not the subject of the suit against MoDOT.

1. Estoppel

Appellants raise a final argument, that the title to the Property did not transfer to MoDOT because the general warranty deed purporting to transfer the Property to MoDOT states the Association is the fee simple owner of the Property, and title had vested in the homeowners regarding five of the six parcels of common land under their respective deeds granting 20-year periods of title in the Trustee. The trial court found in its summary

---

[8] Though we do not decide on this basis, even under the Indenture's power of sale, this sale was not necessarily void. Neither party established whether the land sold to MoDOT was part of the Subdivision's density computation. If Appellants did establish that the Trustee acted outside the limitation of the power of sale because the land was part of the density computation, they would still have to overcome the fact that they waited nearly two years to bring suit. Cf. Hrovat v. Bingham, 341 S.W.2d 365, 368 (noting if trustee for holder of mortgage legitimately attempts to foreclose, sale is not void even if foreclosure power improperly exercised, and remedy is in equity); Adams v. Boyd, 58 S.W.2d 704, 707-08 (Mo. 1933) (though purchaser required to take notice that conditions upon trustee's power to act have been complied with, plaintiffs failed to assert invalidity of sale for nearly two and one-half years when facts were known).

15

judgment that Appellants' claims were barred because they accepted the benefits and proceeds from the sale of the Property. To the extent Appellants argue that title improperly passed to MoDOT because Appellants were not listed as the fee simple owners on the deed transferring the Property to MoDOT, we agree that their claim is barred.[9]

"There is no rule of equity more firmly settled and more just and reasonable than that one who knowingly receives the purchase price of his own estate sold by one assuming to act under a valid power estops himself, in equity, from denying the power." Lytle v. Page, 591 S.W.2d 421, 424 (Mo. App. S.D. 1979) (quoting Cobb v. Massey, 160 S.W.2d 733, 735 (Mo. 1942)). This is true even where one claims that the seller did not have title to the property sold. Id. (citing Rhodus v. Geatley, 147 S.W.2d 631, 638 (Mo. 1941)) ("where one received part of the purchase price at a judicial sale, he may not thereafter question the validity of the sale, even though it be absolutely void").

Here, the question is whether Appellants accepted the proceeds of the sale. They argue that they never received any proceeds, but rather the Association retained the proceeds. They also argue that of the funds distributed directly to homeowners, these were not considered proceeds from the sale, but rather compensation for the diminution in home values due to the highway project.

However, the undisputed facts show that the Association hired one of the top Missouri real estate and eminent domain attorneys to negotiate a purchase price of $1.5 million for approximately 27 acres of land, and the Association received those funds as Trustee of the Subdivision. It is also undisputed that the Association used the funds, at

---

[9] Additionally, regarding MoDOT's estoppel argument, Appellants similarly argue that it was waived. We find that MoDOT did raise the defense of estoppel. Specifically as it related to the factual allegation that Appellants accepted the benefits of the sale, the parties argued this issue in front of the trial court, and the court denied Appellants' motion to strike this defense. The trial court did not err in these determinations.

16

least in part, to benefit all Appellants as beneficiaries under the Indenture. After receiving input from homeowners, the Association spent $250,000 on a new pool for the Subdivision. While the parties dispute the purpose of the direct distributions of funds to particular affected homeowners, the pool renovations are undisputed. It is also undisputed that while all of this was taking place, Appellants waited nearly two years before raising any claim that the sale was invalid. We find that under these circumstances, Appellants are barred from claiming that title did not properly pass to MoDOT.[10] See Roach v. Kohn, 235 S.W.2d 284, 288 (Mo. 1951) ("When a sale of land is made can the sellers have the money from the sale and, repudiating their deed, have also the land?"). Any claims that the Association mishandled the funds are a separate matter, which we discuss below.

Thus, given the recorded instruments as well as Appellants' actions here in response to the sale of the Property, we find the trial court did not err in granting summary judgment in favor of MoDOT. Point I denied.

### Judgment in Favor of the Association and CMA

Appellants argue in Point IV that even if the summary judgment in favor of MoDOT was proper, the trial court erred in granting summary judgment in favor of the Association and CMA on the same grounds, because the issues raised in the suit against the Association and CMA were not disposed of by determining that the Association had the power to sell the Property to MoDOT. We agree.[11]

---

[10] Even if we found this claim was not barred, there is some authority that may allow the Association and MoDOT to seek to reform the deed: "Where there is no fraud and the rights of third parties have not intervened, and equity could have reformed the deed, it may be amended by a subsequent instrument so as to effectuate the intention of the parties." Mo. Land Dev. I, LLC v. Raleugh Dev., LLC, 407 S.W.3d 676, 687 (Mo. App. E.D. 2013) (quoting Church v. Combs, 58 S.W.2d 467, 470 (Mo. 1933)).

[11] As a threshold issue, Appellants advanced a second argument in Point III, that the trial court's summary judgment in favor of the Association and CMA was improper because these parties failed to file an answer to the fifth amended petition. Point III is denied as moot in this respect. To the extent Appellants argue, however, that the Association and CMA have admitted the facts contained in the fifth amended petition by

17

Appellants raised five claims against the Association and CMA. These included claims for money had and received (Count 5), breach of fiduciary duty (Count 6), negligence (Count 7), an accounting (Count 8), and violation of the Missouri Merchandising Practices Act (MMPA) (Count 9).

In their motion for summary judgment, the Association and CMA asserted the same argument that MoDOT relied upon: that the Association had the authority to sell the Property. They informed the trial court that "the ground for [their] current motion is substantially similar to that of [MoDOT]." The Association and CMA argued that finding the Association had the power to sell the Property defeated all nine of Appellants' claims. The trial court's summary judgment in favor of the Association and CMA similarly focused on this issue. The findings of fact and conclusions of law were identical to those contained in the summary judgment in favor of MoDOT.[12]

However, all of Appellants' claims against the Association and CMA had to do with the Association's fulfillment of duties as Trustee, regarding the propriety both of carrying out the sale of the Property and in managing the funds received from the sale. Even assuming the Association's power to sell the Property, the trial court's findings do not dispose of Appellants' claims in Counts 5 through 9 as a matter of law.

---

failing to file an answer, because this issue will surface upon remand, we note that "[a]lthough the filing of an answer is mandatory, the opposing party waives the requirement unless it requests enforcement by timely and proper action." St Louis County v. St. Louis County Police Officers Ass'n, Local 844, 652 S.W.2d 142, 145 (Mo. App. E.D. 1983) (noting defendants did not admit averments in petition by failing to file answer where plaintiff did not object to failure to file answer before proceeding on the merits). We see nothing in the record calling for the conclusion that the Association and CMA have admitted the facts contained in Appellants' fifth amended petition, but we leave it to the trial court to determine upon remand.

[12] One paragraph of factual findings regarding the distribution of the sale proceeds from the judgment in favor of MoDOT was omitted from the judgment in favor of the Association and CMA, but all other findings were identical.

First, Count 5 was a claim for money had and received. Appellants alleged that the Association and CMA "received money to be held in trust for [Appellants]" and that "rather than turning the money over to [Appellants]," they "misappropriated the trust funds." On a claim for money had and received when it relates to money received by the defendant to be held in trust, a plaintiff must simply show that the defendant misappropriated funds in violation of the trust and that the plaintiff has an equitable right to the funds. Alarcon v. Dickerson, 719 S.W.2d 458, 461-62 (Mo. App. W.D. 1986). Thus, Appellants' claim that the Association and CMA misappropriated the funds received from MoDOT in violation of their duties as Trustee is a separate question from the determination of whether Appellants legally obtained those funds through the sale of the Property. While we make no judgment as to whether Appellants would actually succeed on this claim, neither the motion for summary judgment nor the trial court's summary judgment addressed it.

Similarly, in Count 6, Appellants alleged that the Association and CMA breached their fiduciary duties, including that they "used and appropriated various funds received from [MoDOT] improperly and incorrectly," and that they "concealed from Appellants various aspects of the purchase . . . of the [Property]." Regarding the allegation that they misappropriated funds held in trust, we note only that when a plaintiff makes such an allegation, "the plaintiff may sue either for the breach of trust in tort or for the money had and received." Perez v. Boatmen's Nat'l Bank of St. Louis, 788 S.W.2d 296, 299 (Mo. App. E.D. 1990). As we have said, this issue is not addressed in the summary judgment record. However, Appellants will have to elect their remedy on this claim. See id.

Count 6 also claims the Association and CMA breached their fiduciary duties by concealing aspects of the purchase. Count 9 contains a similar factual allegation that the

19

Association and CMA concealed material facts regarding the sale of the Property, and claims they violated the MMPA thereby. Regarding both of these claims, the summary judgment record fails to establish the existence and extent of the Association's and CMA's duty to inform Appellants of the details of the sale, and the record lacks establishment of undisputed material facts related to any breach of such duty or obligation as a trustee or under the MMPA.[13] Thus, summary judgment was improper on Counts 6 and 9.

Count 7 is a negligence claim, alleging that the Association and CMA breached their "duty to manage and safekeep and properly apply monies received by [the Association] regarding the condominium association" by "negligently paying monies out in unequal portions to condominium owners." Again, this claim does not concern the Association's power to sell the Property, but rather how it as Trustee managed the funds received from the sale. This is not addressed in the summary judgment record, and summary judgment was improper on this count.

Finally, in Count 8, Appellants requested an accounting. There is nothing in the summary judgment record determining that Appellants are not entitled to such an accounting, separate from the matter of whether the Association had the power to sell the Property. In fact, keeping an account of trust funds and showing such account to the beneficiaries is one of the duties of a trustee. Pazdernik v. Stemler, 804 S.W.2d 789, 793 (Mo. App. E.D. 1990). Thus, the trial court's summary judgment regarding Count 8 was improper.

In summary, the record fails to contain undisputed material facts establishing that the Association and CMA were entitled to judgment as a matter of law on Counts 5 through

---

[13] Appellants argue in Point II that material fact disputes exist regarding whether the Association notified Appellants of the sale of the Property beforehand. Point II is granted in this respect.

9. Thus, summary judgment was improper regarding these claims. Leavitt v. Kakadiaris, 452 S.W.3d 235, 239 (Mo. App. E.D. 2014) ("This Court will affirm a summary judgment under any theory supported by the record; however, where it is unclear from the summary judgment record that a basis exists for the grant of summary judgment, this Court will reverse"). While this by no means assures Appellants will prevail on these claims, they were entitled to adjudicate them. Point IV granted.

## Conclusion

The Association had authority under the Indenture and the general warranty deeds to sell the Property, and Appellants had no power to sell their interest in the Property independent of a sale of their lots or dwelling units. Appellants similarly had no direct right to receive the proceeds of the sale, except as beneficiaries under the Indenture. Thus, MoDOT did not violate Appellants' rights in purchasing the Property from the Association. Additionally, because Appellants accepted the benefits of the sale as beneficiaries of at least the pool improvement project undertaken by the Association as Trustee, they are estopped from contesting the validity of the sale. The trial court's summary judgment in favor of MoDOT is affirmed.

However, the trial court's summary judgment, as well as the summary judgment record, fail to establish the facts necessary to properly grant summary judgment on Appellants' claims against the Association and CMA as a matter of law. Thus, the trial court's summary judgment in favor of the Association and CMA is reversed and remanded

21

for further proceedings consistent with this opinion.

_Gary M. Gaertner, Jr._, Judge

Philip M. Hess, P.J., concurs.
Angela T. Quigless, J., concurs.

22